J. J. BARTLETT v. THE STATE.

No. 13605.   Delivered November 5, 1930.
State's Motion for Rehearing Denied May 6, 1931.

The opinion states the case.

*Bunnenberg & Nelson,* of Wichita Falls, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

MARTIN, JUDGE.—Offense, assault to rape; penalty, five years in the penitentiary.

Appellant at the time of the alleged commission of the offense was a deputy United States marshal residing in the town of Wichita Falls and had an office in the basement of the court house. He was at this time sixty-two years old. The prosecutrix was a child about seven years old, who testified in substance that appellant took her to his office in the daytime and there assaulted her. Her stepmother, Mrs. Williams, and others testified to a recent complaint made by prosecutrix. The appellant introduced the sister, grandmother and other blood relatives of prosecutrix, who testified to the bad reputation of her stepmother for truth and veracity and to other facts tending to support the appellant's theory that her stepmother was the instigator of the charge against appellant. The county health officer, a physician, was introduced by appellant as a witness, who testified he made an examination of the private parts of the little child alleged to have been assaulted a short time after the alleged assault and found no bruises, lacerations or indications of an assault. Appellant denied in toto the transaction, claiming that Mr. White, at whose house the stepmother and the little child boarded, was an applicant for his position. Other testimony was introduced showing the surroundings at the place of the alleged assault which tended

to prove it not reasonably probable that a man would assault a child at such place.

The evidence is such as to make appellant's guilt gravely doubtful. Considering this record as a whole, we regard the evidence as meagerly sufficient, if at all, to support the conviction. In view of this state of the record we think the following shows error, which may have turned the scales against appellant: The father of the little child was permitted to testify in part over objection that appellant came to where he was some week or so after the alleged rape and spoke to him, to which he answered: "I am an invalid and seems like the world knows it, they have taken advantage of me." The district attorney over objection was permitted to state to the jury that the child's father was "a man with a broken hand and paralyzed and wholly unable to defend himself or the honor of his family." The testimony was clearly inadmissible and tended to prove no issue in the case and its effect plainly was to create prejudice against appellant, particularly so in connection with the comments of the prosecuting attorney, recited above. For this error, the judgment is reversed and cause remanded.

*Reversed and remanded.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

Hawkins, J., absent.

### ON STATE'S MOTION FOR REHEARING.

MORROW, Presiding Judge.—The State contends that the judgment should be affirmed. In passing upon the motion, a more comprehensive statement of the evidence than that contained in the original opinion is deemed necessary. In the afternoon of Saturday, August 10, 1929, the appellant, sixty-one years of age, in company with his wife, took their son, Travis, twelve years of age, to a barber shop, after which they proceeded to the home of Mrs. White, where Mrs. Bartlett remained. Bartlett requested and received permission to take Tempie Mahota Williams and her eight-year-old step-sister, Govey Howard, together with Travis Bartlett, to a picture show. The Williams family and the prosecutrix were residing at the time at the home of Mrs. White. Touching what followed the testimony of the prosecutrix is in substance this: Before going to the picture show the children and the appellant went to the court house and entered the office of the appellant, which was situated in the basement. The appellant was a United States deputy marshal and occupied as an office a room in the basement of the court house. After leaving the barber shop, Travis accompanied Govey

Howard to the picture show. From the testimony of the prosecutrix we quote:

"When we went in Mr. Bartlett's office he locked the door and then he put me in one chair and stated that it was too high and then put me in another chair and stated that was too low, and then he laid me on the bed. When he put me in the chair he did something else with his trousers. He unbuttoned them. I was wearing little blue bloomers that day. There was something done with them. He took one leg off, Mr. Bartlett did. Mr. Bartlett took one leg of my bloomers off. I know what a man's privates are. It's that thing down between his legs. He had that out and I saw it. While that was going on someone came to Mr. Bartlett's room. I do not know who it was. It was a man. Mr. Bartlett just talked about some business. That was while I was in the chair. Before this man came in he had to unlock the door. He buttoned his pants up before he unlocked the door. I don't remember what this man and Mr. Bartlett talked about. This man left the office after awhile. When this man left Mr. Bartlett shut the door and laid me on the bed. There was a little cot in Mr. Bartlett's office. After he laid me on the cot he finished it. He laid me on the bed and he was on top. He unbuttoned his pants and he took out his thing he's got down between his legs. My bloomers were just pulled down. Mr. Bartlett put this thing between my legs, right close to that little place between my legs. It was touching it. He moved it up and down. It mashed me a little bit and I was sore a little bit. He kept on doing that just a little while. Then he got some shirts and told us to wipe ourselves. I wiped myself. I wiped some little sticky white stuff off.

"I had not seen anything like that before. He wiped with the shirt just what I did, that thing he had down between his legs. We then went to the picture show. While we were down there Mr. Bartlett told me not to tell anyone. He didn't say why not to tell it; he just told me not to tell. He didn't say anything about anybody being in the other office, about some officers being out there. He told me not to scream or holler for there were some officers in the other room. He did not say what they would do.

"I told Jack about this, and I told Govey. Govey told mother. I talked to her and told her. I told daddy. Mother told Mrs. White and I was there. I talked to Mrs. White at the same time. I told mother and daddy and Mrs. White the same day in the morning that I came over and talked to his man. When we girls over there got up in the morning we took a bath. Me and Jack and Govey all bathed together. All three of us bathed that morning but that was not the time I told Jack and Govey."

Mrs. J. E. Williams, the stepmother of the prosecutrix, testified that in the afternoon of the day mentioned the appellant, with her con-

sent, left the home of Mrs. White with the prosecutrix and her sister Govey to go to a picture show, and returned with the children at about six o'clock that evening. About a week thereafter she had a conversation with the prosecutrix, "which conversation had something to do with what happened on the previous Saturday. She accused someone of doing something to her." This was immediately communicated to the husband of the witness, the father of the prosecutrix, in the presence of the prosecutrix and Mrs. White.

Mrs. White testified that on the day of the appellant's arrest she heard a conversation in which the prosecutrix said that something had happened to her. Mrs. Williams was present.

Richardson, a constable, gave testimony for the State. He said that on the day in question he entered the office of appellant on business and saw a little girl sitting in a chair where she remained during a short conversation between the appellant and the witness. From this witness the following appears: The constable's office was originally one large room. The United States deputy marshal's office was carved out of the room by a thin partition of beaver-board or sheet rock. There were two doors to this office. One door opened to the street and the other opened into the constable's office. A light usually burned in the marshal's office. There were windows with frosted glass. After conversing with the appellant the witness stepped into his own office about four feet from the door while waiting for a man with whom he had an appointment and remained there for a few minutes. While standing there Bartlett opened the door and asked Richardson if Travis had been seen in the appellant's office. From Richardson's testimony we quote: "He came out of the office just as I did. I recall him saying as I stepped out of the office, he said, 'I want to find my boy,' * * * and I believe he went down towards the hall."

The witness said further: "As I recall it, he came out of the office with me. I don't know where he went after that."

The witness said that the wall was covered on either side with sheet rock; that it was not a substantial wall but was what he would call a "make-shift."

Govey Howard, a State's witness, testified that she went to the barber shop together with her brother Odie, and Mahota, riding with the appellant in his car. She and Odie got out of the car near the barber shop and left Mahota and Mr. Bartlett in the car. Appellant told them to go to the picture show, which they did, and after waiting a good little while, Mr. Bartlett and Mahota came. After their arrival, the children went to the show and Mr. Bartlett returned to the office. The witness after waiting a short time for Travis, came straight from the barber shop to Bartlett's office with Travis, who talked to his father. There was a man there whom the witness did not know.

The appellant's testimony was in substance as follows: On the occasion in question, he took in his car the two girls (Mahota Williams and Govey Howard) and his son, Travis, who was left at a barber shop. After they reached a point on the way to the picture show Govey got out of the car to go with Travis to the barber shop. Mahota remained in his car and went with him to his office. Passing through the constable's office, the appellant entered his own, leaving the door open. Richardson came in at once. After a conference with the appellant, Richardson stepped out of the door, which the appellant had not closed. Appellant then folowed out and inquired for his boy, Travis, and was told by Richardson that he had seen Travis pass. After learning from Richardson that Travis had passed, the appellant left in two or three minutes, taking the little girl with him to the picture show. Appellant and Mahota reached the picture show about the same time that the other children arrived here. The appellant then got tickets for them and they went into the picture show. He returned to his office. The children came back to his office about six o'clock and he took them home. Appellant denied categorically all the matters about the assault. He testified that the records of the marshal's office showed that Mr. White had applied for the position which he (appellant) occupied.

It appears that an investigation was made by the Federal government and affidavits taken from persons cognizant of the facts. One of these, dated about nine days after the alleged transaction, was that of Travis Bartlett, in which he went into some detail and was to the effect that after leaving the barber shop he joined Govey Howard and went to the office of the appellant, where he observed his father, the prosecutrix and a man. From there he went immediately to the picture show. He was met there by his father (the appellant), who had Mahota with him. The witness, his father and Mahota reached the picture show about the same time. This affidavit was introduced in evidence. He gave testimony on the trial to the same effect.

Several witnesses testified that the reputation of the State's witness, Mrs. J. E. Williams, for truth and veracity was bad. One of these was Mrs. Hash, the full-blooded sister of Mahota Williams. After the death of her mother, the witness had been in the attitude of a mother to the child. Later, her father married Mrs. Williams who assumed control of the child; that she had had a conversation in which she (Mrs. Hash) asked her about the occurrence. This was after the prosecution of the appellant had begun and inquiry was made of the child touching it. The child said: "Sister, don't ask me. I don't want you to ask me. Sister, I don't know; don't ask me. I don't want to talk about it."

The witness admitted on cross-examination that she did not like Mrs. Williams; that she had lived in her household but that she had a right to hate her because she had lied about the witness.

B. E. Williams, a brother of the father of the prosecutrix, testified that the general reputation of Mrs. J. E. Williams for truth and veracity was bad; that she had refused to allow the blood relatives of Mahota to see her; that she had refused to allow the witness to see her. He said that he did not know the appellant personally but he knew Mrs. Williams well enough to believe that "she is the head of the thing." "I mean that she has enticed this little girl to say this."

Mrs. Allie Martin, sixty-one years of age, mother of J. E. Williams, said she left her daughter-in-law intentionally; that the general reputation of Mrs. J. E. Wiliams for truth and veracity was bad; that she was not worthy of belief upon oath.

Another witness testified that she had washed the shirt and clothes worn by the appellant; that they had been examined by her; that they exhibited no evidence of discharge.

A doctor testified that he examined Mahota Williams under the direction of the district attorney and in the presence of a nurse, while the girl's father and stepmother were in the adjoining room. His conclusions were in the following words: "I found absolutely nothing as a result of the examination. I did not find any evidence of penetration. I did not find any abrasion or bruises. I did not find any physical marks. I did not find any evidence or soreness or stiffness. I did not find any evidence of inflammation of any sort. I found the hymen intact. After I made my examination I called the district attorney's office and told him what I had found."

The essential elements of the offense of rape are the carnal knowledge of a woman without her consent obtained by force, threats or fraud; or the carnal knowledge of a woman without the mental capacity to consent; or the carnal knowledge of a girl below the age of consent. Art. 1183, P. C., 1925.

Assault to rape is thus defined: "If any person shall assault a woman with the intent to commit the offense of rape, etc." Whether an assault with intent to have carnal knowledge of a girl under the age of consent could come within the purview of the statute denouncing the offense of assault with intent to rape was long a question upon which the members of this court were not in harmony. In Hardin's case, 39 Texas Crim. Rep., 426, 46 S. W., 803, it was held that such an act did not come within the purview of the statute. Presiding Judge Hurt wrote the majority opinion, Judge Davidson concurring and Judge Henderson dissenting. Subsequently, after the death of Judge Henderson and the retirement of Judge Hurt, a contrary view was expressed by the majority composed of Judge Brooks and Judge Ramsey in the case of Cromeans v. State, 59 Texas Crim. Rep., 611, 129 S. W., 1129. Upon rehearing, Judge Cobb, who was specially appointed, wrote the opinion

of the court reversing the conviction, but as to the existence of the offense, used in substance the following language:

"If an adult male takes hold of a female under the age of eighteen years and handles her in such manner as under the circumstances of the particular case demonstrates a present intent to at once so subject her to his will, she consenting or not, as that he may then at the very time have carnal intercourse with her, he would be guilty of an assault with intent to rape.

"On the other hand, if such person so takes hold of such female for the purpose only of kissing her or fondling her, having no intent to have carnal knowledge of her at the very time, he would not be guilty of assault with intent to rape. There must be such force used in connection with the circumstances of the case to establish beyond a reasonable doubt the purpose of the defendant to at the very time have carnal knowledge with the female in question, with or without her consent, regardless of how slight said force may be."

See Heubsch v. State, 94 Texas Crim. Rep., 464, 251 S. W., 1079.

Presiding Judge Davidson agreed to the reversal of the Cromeans case but held to the opinion in the Hardin case, supra. Since the Cromeans case, 59 Texas Crim. Rep., 611, 251 S. W., 1029, was decided in 1909, the court has regarded the conditions just quoted as defining an assault with intent to rape. The question therefor arises: Do the facts adduced in the present instance show an assault with intent to rape as that offense is defined in the Cromeans case, supra, and the subsequent announcements of this court? See Thompson v. State, 82 Texas Crim. Rep., 524, 200 S. W., 168, Carter v. State, 87 Texas Crim. Rep., 299, 221 S. W., 603; Robat v. State, 91 Texas Crim. Rep., 468, 239 S. W., 966; Lynch v. State, 102 Texas Crim. Rep., 639, 279 S. W., 271; Enfield v. State, 94 Texas Crim. Rep., 227, 250 S. W., 162; Mooring v. State, 90 Texas Crim. Rep., 129, 234 S. W., 70; Price v. State, 90 Texas Crim. Rep., 534, 236 S. W., 722; Huebsch v. State, 94 Texas Crim. Rep., 461, 251 S. W., 1079.

Whether the appellant made an assault of any character upon the child is controverted by very cogent evidence coming from witnesses for both the State and the appellant. The circumstances surrounding the accused and set forth by the uncontroverted evidence are calculated to throw much doubt upon the accuracy of the statement of the little girl. The assault is charged against a man sixty-one years of age, holding at the time an important government position, and so far as the record shows, had led a blameless life. The place of the alleged offense was an office accessible to the public from the street and through an improvised partition wall separating his office from that of the constable, a public officer. The partition was one through which voices could be heard. The time was in the middle of the afternoon. The testimony

of the State's witness Richardson to the effect that he and the appellant left the office at the same time coincides with the testimony of the appellant and his witnesses that but a few moments elapsed from the time the little girl enterd the office until she departed. Some of the witnesses used by the State gave testimony to the effect that the appellant and the little girl reached the picture show about the same time that the other children arrived at the same point. Assuming that the appellant was guilty of indecent familiarity with the child, that the proof shows an attempt to commit rape is open to serious question. If the little girl's testimony be true, the appellant was in his room with the door locked. She was making no protest. From her testimony no reason appears why the appellant should have desisted if, in fact, he had the intent of going to the extent which the law demands in defining an assault to rape. The little girl was not injured. She went with the appellant to the picture show and was happy with the other children and returned to her home. According to the State's witnesses, Mrs. Williams and Mrs. White, the prosecutrix revealed the occurrence about a week after it took place. Mrs. Williams admitted in her testimony that she had instructed the girl not to talk about the matter. The testimony of one of her relatives was such as to suggest that the child was under the dominion of Mrs. Williams, (her stepmother) to a degree that the child protested against making any recital of it to her own sister. On cross-examination the child displayed an absence of knowledge of things that a child of her age might be expected to know. The reputation of Mrs. Williams for truth and veracity was impeached. She did not declare that she found upon the girl any physical evidence which would demonstrate an assault such as the law contemplates in defining an assault to rape. At the time of the alleged assault, Mrs. Williams was living at the home of Mrs. White, and according to the evidence, Mrs. White's husband was seeking to supplant the appellant in the official position which he held. The ex parte testimony of the appellant's youthful son (who was with the other children at the picture show), and which evidence was taken by an agent of the government a few days after the alleged occurrence, coincides with that of the appellant and the State's witness Richardson going to show that the little girl was in the appellant's office but a very short time, and also coincides with the appellant's explanation of the separation and reunion of the children. It further coincides with the appellant's testimony to the effect that three children were in his automobile; that two of them accompanied the appellant's son to the barber shop and from there to the picture show, leaving the little girl with the appellant, and that the children and the appellant all reached the picture show at about the same time.

It is the opinion of the writer that the record fails to show a state of facts which would support a conviction for an assault with intent to

rape, and that the little girl's testimony, if true, would support no greater offense than that of aggravated assault.

"The intent to commit rape at the immediate time is deemed an imperative necessity. As said by Judge Cobb, the handling of the female must be such as 'under the circumstances of the particular case demonstrates a present intent to at once so subject her to his will, she consenting or not, as that he may then at the very time have carnal intercourse with her.' 'If, on the other hand, he takes hold of her for the purpose only of kissing her or fondling her, having no intent at the very time to have carnal knowledge with her,' the offense is not an assault to rape."

Illustrative cases are the following: Thompson v. State, 82 Texas Crim. Rep., 524, 200 S. W. 168; Blackstock v. State, 91 Texas Crim. Rep., 106, 237 S. W., 282; Stoker v. State, 93 Texas Crim. Rep., 24, 245 S. W., 444; Huebsch v. State, 94 Texas Crim. Rep., 461, 251 S. W., 1079; Lynch v. State, 102 Texas Crim. Rep., 638, 279 S. W. 271.

There are criticisms of the charge of the court. While not prepared to approve the charge, a discussion of it is deemed unnecessary in view of the opinion hereinabove expressed. Suffice it to say that we assume that upon another trial (if one be had) the charge will be in a different verbiage.

The State's motion for rehearing is overruled.

*Overruled.*