# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00495-CV

**Byron D. Neely, Individually and Byron D. Neely, M.D., P.A., Appellants**

**v.**

**Nanci Wilson; CBS Stations Group of Texas, L.P., d/b/a KEYE-TV; and Viacom, Inc., Appellees**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT NO. D-1-GN-04-001858, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING**

---

## O P I N I O N

Following an Austin television station's broadcast of an "investigative" news report that negatively portrayed his work as a neurosurgeon, Dr. Byron Neely and the professional association through which he practiced, Byron D. Neely, P.A. (collectively "Neely," except when the distinction is relevant), asserted causes of action for libel against the reporter who had written and presented the story, Nanci Wilson; the television station, CBS Stations Group of Texas, L.P. d/b/a KEYE-TV ("KEYE"); and KEYE's owner, Viacom, Inc. The defendants moved for and obtained summary judgment as to each of Neely's claims. Neely appeals. For the reasons explained herein, we will affirm the district court's judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

The facts summarized below are taken from the summary-judgment evidence, presented in the light most favorable to Neely, the non-movant.

As of the time of the broadcast in question, Neely was a board-certified neurosurgeon who had maintained a private practice in Austin for more than twenty-five years. At relevant times, Neely had privileges at Austin's St. David's Hospital. By the time the broadcast aired, Neely had performed over four thousand surgeries. Of these, seven had given rise to medical-malpractice suits in which Neely was named as a defendant. All of the suits had been predicated on alleged acts occurring in 1994 or after, and at least four had arisen in 1999 or later. In four of the suits, the claims against Dr. Neely had been settled. In one suit, the claims against Dr. Neely had been non-suited "with prejudice." In the remaining two cases, both of which had been filed by pro se plaintiffs, the claims against Dr. Neely had been involuntarily dismissed.

As we will detail below, the broadcast stated that Neely had been sued four times but explored the subject matter of only two of these actions. The first, brought by former patient Paul Jetton and his then-wife, Sheila, on behalf of themselves and their three children, alleged that Neely, another neurosurgeon, and St. David's Hospital had been negligent in providing medical care to Paul in September 1999.[1] Paul had been referred to Neely by another physician after an MRI had detected a small mass in his midbrain. Neely diagnosed Paul as having a lesion in his brain and secondary hydrocephalus (a build-up of fluid on the brain). Neely performed surgery to insert a

---

[1] Because Paul Jetton and Sheila Jetton had the same last name, for clarity we will refer to them by their first names.

shunt to draw fluid from Paul's brain, utilizing a "Torkildsen shunt" procedure, which entailed inserting the shunt near the base of Paul's brain. The surgical team encountered difficulties that included challenges in positioning Paul—a former University of Texas and NFL lineman who stood 6' 4" and still weighed almost 300 pounds—and the procedure ultimately lasted almost eight hours. While Paul was hospitalized after surgery, he developed an enterobacterial infection. Neely recommended removing the shunt, but Paul, at Sheila's insistence, chose to follow the advice of an infectious disease doctor who recommended discharging Paul and treating the infection at home with antibiotics. Reluctantly, Neely approved Paul's discharge from the hospital, although he did not indicate "AMA" (against medical advice) in Paul's medical records. After discharge, Paul developed serious complications from the infection, including a brain abscess, meningitis, and syrinx (accumulation of fluid in the spinal cord). Paul returned to the hospital where Neely removed the shunt. As of the time of the broadcast, Paul had undergone as many as twelve additional brain surgeries and was physically disabled, requiring aid of a walker to walk.

In their suit, the Jettons alleged that Neely had been negligent in performing surgery to insert a shunt to drain fluid without proper indications for such surgery, in opting to utilize the Torkildsen shunt procedure, in performing the procedure improperly, in allowing the surgical site to get infected, in positioning Paul in a way that caused permanent damage to his ulnar nerve, and in failing to remove Paul's infected shunt before discharging him. Additionally, the Jettons alleged that when providing medical care to Paul, Neely had been impaired by dependency on steroids and opiates and had hand tremors attributable to the medications he was allegedly taking.

3

Over the years, Neely had suffered from a variety of ailments and injuries—including severe asthma and allergies, spastic colon, and a torn rotator cuff—for which other physicians had prescribed him pain-killers, muscle relaxants, and other medications. These medications included steroids, narcotics, and opiates. By 1999, it is undisputed that Neely had begun self-prescribing refills of many of these medications. Neely asserted that this was a common practice among physicians and one that at the time was not explicitly prohibited by any law. While Neely acknowledged that some of these medications were capable of impairing his medical competence, he steadfastly maintained that he never used them at times or in amounts that actually did impair him. After discovery uncovered information regarding Neely's use of these medications, the Jettons alleged otherwise.

Relatedly, Neely acknowledged that he suffered from hand tremors beginning in 1999 that several other individuals, including Sheila Jetton, had witnessed. He attributed the tremors to his "tapering" of his dosage of a steroid allergy medication that he had taken for decades. Neely claimed that he could predict when the tremors would occur and that he could "control" them by "holding [his] hands down on the patient."

In June 2003, the Jettons' claims against Neely were settled for $500,000—the limits of Neely's professional liability insurance policy. Neely did not admit liability, but settled the claims because of Paul Jetton's "high profile status" as a former Texas Longhorn and NFL player and the "sympathetic nature of his injuries."

Along with their suit, the Jettons filed a complaint against Neely with the Texas Board of Medical Examiners (now the Texas Medical Board) ("the Board") regarding his

4

medical care of Paul. The Board dismissed the complaint in June 2003 after finding no violations of the medical practice act. Although the district court excluded from evidence a letter from the Board informing Neely of its disposition of the complaint, the broadcast, which was in evidence, noted that the Board had found "no wrong doing" in Neely's care of Paul.

The second suit discussed in the broadcast had been brought by Li Yu, the ex-wife of a former Neely patient, Wei Wu. In November 1999, Neely had performed surgery on Wu to remove a brain tumor. A biopsy of the tumor revealed it to be a malignant metastatic melanoma (skin cancer that had spread to his brain). Neely also determined, upon visual inspection during surgery, that the cancer had spread to numerous other sites throughout Wu's brain. Based on the surgery results and the pathology report, Wu's oncologist informed Wu that, all other things being equal, he would probably have a short time to live and recommended that he be evaluated at M.D. Anderson for experimental melanoma treatments. Several days later, Wu, a TxDOT engineer, committed suicide by jumping from the U.S. 183 overpass over MoPac in Austin. The Travis County Medical Examiner's office conducted an autopsy and concluded that, contrary to the diagnosis Wu had been given, Wu's brain following surgery showed "no residual metastatic melanoma on gross inspection."

Yu, acting pro se, sued Neely, the oncologist, and St. David's for medical malpractice, alleging, in part, that Neely and the oncologist misdiagnosed Wu as having cancer throughout his brain when, in fact, he did not. This and other actions, Yu further alleged, contributed to Wu's suicide. In a separate proceeding, Yu also sued various TxDOT personnel for allegedly causing Wu's suicide through their mistreatment of him. Although pro se and no longer married

5

to Wu, Yu purported to sue on behalf of Wu's estate and a minor child of their marriage. The district court dismissed Yu's suit in part because Yu was not a licensed attorney and thus could not act as counsel for the estate and the child. A complaint was also filed with the Board, but it was dismissed after the Board found that Neely had not violated the medical practice act. The district court excluded from evidence a letter from the Board advising Neely that it had found no violations.

The broadcast also discussed a 2003 disciplinary action that the Board had taken against Neely on a 2002 complaint that he had been prescribing controlled substances to himself that had the potential to interfere with his ability to perform surgery.[2] The Board investigated the complaint and, on December 12, 2003, Neely and the Board entered into an agreed order in which Neely, "[t]o avoid further investigations, hearings, and the expense and inconvenience of litigation," accepted a three-year probated suspension of his medical license along with other terms and conditions. Of significance to this case, the agreed fact findings set forth in the order included:

6. Respondent suffered various injuries and ailments, which required a variety of medications. Respondent's treating physician legitimately and appropriately prescribed a number of medications to treat these conditions. However, between 1999 and 2002, Respondent began to refill the medications himself in lieu of scheduled visits. The list of medications Respondent has self-prescribed include Hydrocodone, Soma, Darvocet, Paregoric, Propoxyphene, Carisoprodol, Medrol, Phenergan, Azmacort, Cardura, Prilosec, Lomotil, Ventolin, Norco, and Flonase.

7. Upon review of statements of Respondent and the September 27, 2000 medical records of Respondent obtained from his treating physician, the

---

[2] Neely attributed this complaint to Sheila Jetton.

Panel of [Board representatives] concluded that Respondent had a prior history of tremors.

8. The Panel took notice of the fact that the Board's investigator claims to have witnessed a tremor during the 2002 interview. Respondent asserted the tremor was the result of nervousness about the interview.

The order also included findings that Neely had presented evidence that he had undergone a full physical examination by a board-certified family practitioner, who found him to be in "relatively good health, with no need of chronic medications," and "did not detect a medically significant tremor," but "felt unqualified to determine" Neely's ability to perform surgery. Neely had also relied upon the examination of a board-certified psychiatrist and addictionologist to determine the possibility of substance abuse or addiction, who "found no underlying psychiatric condition that would inhibit Respondent's ability to practice medicine." However, the findings reflected, "[t]he Board is requesting independent physical and psychiatric evaluations to determine Respondent's capacity to practice medicine in general, and specifically, to perform surgery."

Based on these findings, the order concluded that Neely was subject to Board discipline under sections 164.051(a)(4) and 164.056 of the occupations code "due to Respondent's inability to practice medicine with reasonable care and safety to patients, due to mental or physical condition." Section 164.051 authorizes the Board to take disciplinary action against a doctor under various circumstances, and the order's language tracks the circumstances stated in subsection (a)(4)(D) of section 164.051. *See* Tex. Occ. Code Ann. § 164.051(a)(4)(D) (West 2004).[3]

_____

[3] Section 164.051(a)(4) provides in full:

7

Section 164.056 empowers the Board, when enforcing section 164.051(a)(4), to compel physical or mental examinations by physicians designated by the Board. *See id.* § 164.056 (West Supp. 2009). The order further concluded that Neely was subject to disciplinary action under section 164.051(a)(3) of the code, *see id.* § 164.051(a)(3) (committing or attempting to commit a direct or indirect violation of a Board rule), with regard to Board Rule 190.1(c)(1)(M), which was identified as "inappropriate prescription of dangerous drugs or controlled substances to oneself, family members, or others in which there is a close personal relationship."

The Board suspended Neely's medical license but stayed the suspension and placed Neely on probation for three years. Additionally, the order prohibited Neely from serving as a physician for his immediate family members or prescribing, dispensing, administering, or authorizing "controlled substances or dangerous drugs with addictive potential or potential for abuse" to himself or his immediate family. The order further required Neely to be examined by a

---

The board may refuse to admit a person to its examination or refuse to issue a license to practice medicine and may take disciplinary action against a person if the person:

* * *

(4) is unable to practice medicine with reasonable skill and safety to patients because of:

    (A) illness;

    (B) drunkenness;

    (C) excessive use of drugs, narcotics, chemicals, or another substance; or

    (D) *a mental or physical condition*

Tex. Occ. Code Ann. § 164.051(a)(4) (West 2004) (emphasis added).

8

Board-approved physician and evaluated by a Board-appointed psychiatrist who was board certified in forensic or addictive psychology. If it was determined by the physician that Neely had a medical condition that, without adequate treatment, could adversely affect Neely's ability to practice medicine safely, Neely was required to undergo continuing care and treatment for such condition. Similarly, if the evaluating psychiatrist recommended, Neely was to submit to continuing psychiatric care and treatment by a psychiatrist approved by the Board.

Later in December 2003, the Board published a press release announcing that it had taken public disciplinary actions against sixty-one doctors, including Dr. Neely. Subsequently, the *Austin American Statesman* published an article on December 20, 2003, with the headline, "6 physicians disciplined for substance abuse." The article reported that "The Texas board that polices doctors recently disciplined six Austin physicians for violations involving either drug or alcohol abuse." While the article focused primarily on another physician whose license had been suspended by the Board, it mentioned, in bullet points at the end, each of the five other Austin physicians who had been disciplined. Regarding Dr. Neely, the *Statesman* reported that the Board:

> Put Dr. Byron Davis Neely, a neurosurgeon, on probation for three years for self-prescribing medications, according to board records. The order prohibits him from prescribing drugs to himself or his immediate family and includes requirements for a psychiatric evaluation and board monitoring. Neely did not return a call to his office.

Similarly, the Board placed the following statement in its online profile of Dr. Neely on its website:

9

ON 12-12-03 THE BOARD AND DR. NEELY ENTERED INTO AN AGREED ORDER SUSPENDING THE PHYSICIAN'S LICENSE; STAYING THE SUSPENSION, AND PLACING THE PHYSICIAN ON PROBATION FOR THREE YEARS. THIS ACTION WAS BASED ON ALLEGATIONS THAT DR. NEELY HAD SELF-PRESCRIBED MEDICATIONS WITH THE POTENTIAL TO INTERFERE WITH HIS ABILITY TO PERFORM SURGERY. THE TERMS OF THE ORDER FORBID DR. NEELY FROM SELF-PRESCRIBING MEDICATIONS, AND REQUIRE CONTINUING PHYSICAL AND PSYCHIATRIC EVALUATIONS TO VERIFY HIS FITNESS TO PERFORM SURGERY.

The *Statesman* article attracted the attention of appellee Wilson, who at the time was a television news reporter for KEYE. Wilson's role with KEYE was focused on researching, writing, and presenting periodic "KEYE Investigates" reports during the station's newscasts. Wilson began researching issues related to the Board and its disciplinary measures against doctors. She compiled background information that included issue advocacy from the debates earlier in 2003 regarding legislative and constitutional measures to limit medical-malpractice lawsuits in Texas. During those often-heated debates, opponents of the measures had argued in part that the Board's disciplinary apparatus at the time was an ineffective alternative to the tort system in eliminating unsafe doctors and ensuring patient safety.[4] Wilson also compiled information about the specific disciplinary proceedings referenced in the December notice, including Neely's, which led her to the statement in his online Board profile and the agreed order. She also researched court

---

[4] Among other research, Wilson stated that she obtained a February 2003 report from Public Citizen, "Medical Misdiagnosis in Texas: Challenging the Medical Malpractice Claims of the Doctors' Lobby." The report included a section titled "Where's the Doctor Watchdog?" that was critical of the frequency and severity of the Board's discipline of doctors.

10

filings, which led her to the Jettons' counsel and interviews with the Jettons, Yu, and a close friend of Wu's, Peter Gao.

Wilson taped on-camera interviews with the Jettons (in their home, with their three young children present), Gao, and a spokesperson for the Board, Jill Wiggins. Wilson also interviewed a physician representative from St. David's, Steve Berkowitz, M.D., questioning him about the hospital's peer review processes. Wilson also made several attempts to contact Neely. Out of what Neely claims was fear of saying anything that might antagonize the Board and perceiving that the report would be biased anyway, Neely declined to be interviewed for the broadcast. However, Neely's medical-malpractice counsel and his counsel in the Board proceedings both spoke to Wilson and supplied her with materials and information favorable to Neely.

Drawing on her research, interviews, and video footage, Wilson ultimately prepared an investigative report that discussed Dr. Neely, some of his medical-malpractice suits, and the Board's disciplinary action. The report was broadcast during the station's evening newscast on Monday, January 19, 2004. The report consisted of edited excerpts from Wilson's taped on-camera interviews with the Jettons, Gao, the Board's Wiggins, and St. David's Berkowitz; Wilson's own narratives and visuals of such things as the Board's order, the pleadings in Neely's medical-malpractice suits, and Wu's autopsy report (including highlighting and enlargement of certain excerpts); footage of Paul Jetton struggling to rise from a chair and walk with aid of a walker; a graphic of Dr. Neely's name; and footage of Neely's place of business featuring a sign, "Byron D. Neely, P.A." Also, while Dr. Neely was not interviewed, Wilson included an excerpt from a videotaped deposition of him.

11

The appellate record includes a DVD of the original broadcast. A complete transcript

of the audio portion of the broadcast follows:

**Fred Cantu (Anchor):** If you were told you needed surgery would you want to know if your surgeon had been disciplined for prescribing himself and taking dangerous drugs, had a history of hand tremors and had been sued several times for malpractice in the last few years?

**Judy Maggio (Anchor):** A central Texas couple says they didn't learn about this until it was too late. They're outraged the State Board of Medical Examiners is allowing Dr. Byron Neely to continue to practice. KEYE news investigative reporter Nanci Wilson tells us if you go to St. David's Hospital with a head injury you could be Dr. Neely's next patient.

**Paul Jetton:** I've been in, in and out of the hospital, you know, for the last four years. Uh, I had twelve, I believe, I've even lost count, I believe twelve brain surgeries, one spinal surgery.

**Wilson:** This is Paul Jetton's life.

**Paul Jetton:** I can't walk. You know, I still, I can walk with a walker, but I still can't walk on my own.

**Wilson:** Each step is a struggle, but it wasn't always this way. In 1982 Paul Jetton was a linebacker for the University of Texas. He was so good he went on to play in the pros. His first year with the Cincinnati Bengals the team went to the Super Bowl. But in 1999 . . .

**Paul Jetton:** I just wasn't feeling well. When I went, you know, for I just wanted to get a physical.

**Wilson:** Something unusual showed up on the MRI scan of his brain.

**Paul Jetton:** He told me that I had this, this tumor in my brain and, and that I had to, had to have it operated on.

**Wilson:** His doctor, Austin neurosurgeon Byron Neely, who has been in practice since 1977, said an operation would help.

12

**Paul Jetton:**  You know it would only be a two hour surgery and that I'd be in, I'd only be in the hospital for two or three days and I'd go on with the rest of my life.

**Wilson:**  The two hour surgery stretched into almost eight hours and Paul was in the hospital for six weeks. While in the hospital Paul developed an infection in his brain.  However, he was discharged from the hospital anyway.  The result: numerous surgeries and a life of disability.  Paul's wife Sheila says what they learned from other doctors was the final blow.

**Sheila Jetton:**  Every neurosurgeon that's looked at Paul's MRIs from before Neely operated on him have said they would have never done surgery.  They would have watched him with MRIs over years.

**Wilson:**  The Jettons aren't the only patients to raise questions about Dr. Neely.  Wei Wu, a software engineer with two PhDs was referred to Dr. Neely.  Neely explains the case in this deposition from 2002.

**Dr. Neely:**  [From the video of his deposition]  He came in very confused one day, uh, was found to have a uh, very major brain tumor thought to be a meningioma at the time because it, of the location in the brain.  Uh, the patient was taken to the OR thereafter and found to malignant melanoma [sic].

**Wilson:**  Peter Gao was a friend of Wei Wu's.  Gao says Wu struggled with the diagnosis that Wu had only a few months to live.

**Peter Gao:**  The doctor is more like persuasive say, well the doctor have seen when he open, when he opened your skull, seen everywhere.  So, all we need to do right now I guess, is face, kind of like to face the music.

**Wilson:**  It may have been too much for Wei Wu to handle. A few days later Gao found Wu's abandoned car near the 183 overpass at Mopac. Then discovered Wu had jumped off the overpass taking his own life.  But when his body was sent to the Travis County Medical Examiner's office analyzing Wu's brains, examiners noted no residual metastatic melanoma.  Meaning Wei Wu did not have brain cancer.

Both the Jetton and the Wu cases happened in 1999.  Two other patients also filed suit against the doctor.

The State Board of Medical Examiners investigated Dr. Neely.  The board found Neely had a history of hand tremors and that between 1999 and 2002, Dr. Neely was writing prescriptions, not only for his patients but for himself as well.  Narcotics, muscle relaxers and pain killers.  Something former patient Paul Jetton finds shocking.

13

**Paul Jetton:** Narcotics, opiates, I mean it's just things that, I mean things that they don't even let people operate machinery or drive cars when they're, when they're taking them and this guy's doing brain surgery on people. I mean it's just, even now I'm just, it's just incredulous, you just can't even believe that it even happened.

**Wilson:** The State Board of Medical Examiners did discipline Dr. Neely. This past December, they suspended his license but gave it right back by staying the suspension. Now he's on probation for three years. The only requirements are that he see a psychiatrist and not write prescriptions for himself or his family. A decision the board defends.

**Jill Wiggins** [caption identifies her as a Board representative]**:** We have compliance officers and the compliance officers will definitely follow to make sure that he's doing the things that his order requires him to do.

**Wilson:** But how would they know if he is using? He can get somebody else to prescribe him. I mean he could say, "I've followed the order."

**Wiggins:** Right.

**Wilson:** I didn't prescribe myself.

**Wiggins:** Right, right.

**Wilson:** How do we, how do we know that he's, that we're not putting somebody right back out there to do the same thing he was doing before?

**Wiggins:** That's a very good question and why this order doesn't include drug testing, I, I honestly don't know the answer to that.

**Paul Jetton:** I think it's just deplorable, I mean if, if it was another profession, uh, the guy would be in jail.

**Wilson:** We contacted Dr. Neely for his side to the story. He declined to participate, but his attorney told us that two highly qualified neurosurgeons who reviewed the case agree with the medical decisions made by Dr. Neely. In addition, the State Board of Medical Examiners office investigated the Jetton case and found no wrong doing. We also contacted St. David's Medical Center, its chief medical officer believes they have a strong peer review process. That's where individual doctors review each other's work and decide who should have privileges.

**Steve Berkowitz, M.D.:** In this particular case the investigation is incomplete and when we actually find the, get the findings we will then be able to make a determination uh, as to whether the privileges should be continued or not. We strongly value quality of course, we value the due process and most importantly we value patient safety.

**Wilson:** Nanci Wilson, KEYE News investigates.

The camera then returns to the anchors, Cantu and Maggio.

**Maggio:** The Jettons settled their suit against Dr. Neely. The suit filed on behalf of Wu's son was dismissed because it was not filed by an attorney. The other suits are pending.

**Cantu:** The Texas Board of Medical Examiners does post final actions taken against doctors on its web site, but all other information about complaints is kept secret.

Neely sued Wilson, KEYE, and Viacom for libel. Appellees filed a motion for summary judgment asserting both traditional and no-evidence grounds. Neely filed a response with evidence. Both sides filed objections to the other party's summary-judgment evidence. Following a hearing, the district court sustained some of appellees' objections to Neely's evidence and granted appellees' summary-judgment motion without stating the grounds. Subsequently, the district court signed a final judgment that Neely take nothing on his claims. Neely appealed.

## STANDARD OF REVIEW

We review the district court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). Defamation cases are reviewed under the same summary-

judgment standards as other cases even though they involve constitutional considerations. *See Casso v. Brand*, 776 S.W.2d 551, 556-57 (Tex. 1989).

Under rule 166a(i), a movant must assert that, after adequate time for discovery, there is no evidence of one or more essential elements of a claim or defense on which the adverse party would have the burden of proof at trial. Tex. R. Civ. P. 166a(i); *see Fort Worth Osteopathic Hosp., Inc. v. Reese*, 148 S.W.3d 94, 99 (Tex. 2004). To defeat a rule 166a(i) motion, the non-movant must produce more than a scintilla of summary-judgment evidence raising a genuine issue of material fact on the challenged elements. Tex. R. Civ. P. 166a(i); *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). A no-evidence summary judgment is essentially a directed verdict granted before trial, to which we apply a legal-sufficiency standard of review. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750-51 (Tex. 2003); *Perdue v. Patten Corp.*, 142 S.W.3d 596, 603 (Tex. App.—Austin 2004, no pet.). A no-evidence summary judgment will be sustained when: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *King Ranch*, 118 S.W.3d at 751. More than a scintilla of supporting evidence exists if the evidence would allow reasonable and fair-minded people to differ in their conclusions. *King Ranch*, 118 S.W.3d at 750-51. "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *Id.* (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

16

On the other hand, a defendant moving for a traditional summary judgment under rule 166a(c) must conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. Tex. R. Civ. P. 166a(c); *Science Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). Once the defendant has done so, the burden shifts to the plaintiff to produce evidence creating a fact issue on the element or defense in order to defeat the summary judgment. *See Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996).

Where, as here, the trial court does not specify its basis for granting summary judgment, the judgment must be affirmed if any of the grounds asserted in the motion has merit. *See Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995).

**ANALYSIS**

To maintain a cause of action for defamation, as Neely asserts here, a plaintiff must prove that the defendant: (1) published a statement "of and concerning" him; (2) that was defamatory; (3) with the requisite degree of fault with respect to whether it was false. *See WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998); *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989). Because the published statements made the basis for Neely's claims were read from a script and broadcasted, Neely's defamation claims allege libel rather than slander, and are thus governed by chapter 73 of the civil practice and remedies code. *See Christy v. Stauffer Publ'ns, Inc.*, 437 S.W.2d 814, 815 (Tex. 1969). Chapter 73 defines a libel in relevant part as "a defamation expressed in written or other graphic form . . . that tends to injure a living person's reputation and thereby expose the person to public hatred, contempt, ridicule, or financial injury or to impeach

17

any person's honesty, integrity, virtue, or reputation." Tex. Civ. Prac. & Rem. Code Ann. § 73.001 (West 2005); *Abbott v. Pollock*, 946 S.W.2d 513, 519 (Tex. App.—Austin 1997, writ denied).

Implicit in the elements of defamation, and explicit under chapter 73, is that a true statement is not actionable as libel, although the Texas Supreme Court has not yet definitively resolved, for all fact situations, whether a plaintiff must prove the falsity of a statement as an element of his libel claim as opposed to the defendant having the burden of proving the statement's truth as an affirmative defense. *See* Tex. Civ. Prac. & Rem. Code Ann. § 73.005 (West 2005) ("The truth of the statement in the publication on which an action for libel is based is a defense to the action."); *Bentley v. Bunton*, 94 S.W.3d 561, 586 n.63 (Tex. 2003) (reserving question of whether non-public figure is required to prove falsity of statement made by media defendant).

In addition, a libel plaintiff must establish injury and damages from the statement. If the statement is "defamatory per se"—of a nature that the law considers so damaging to reputation that harm to the plaintiff's reputation is presumed—the plaintiff need not plead or prove specific injury or damage to reputation. *See Bentley*, 94 S.W.3d at 604-05; *but see id.* at 605-07 (First Amendment may limit such awards). Otherwise, the statement is "defamatory per quod," and the plaintiff must prove specific injury and damages to prevail. *See Texas Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 580 (Tex. App.—Austin 2007, pet. denied).

In their summary-judgment motion, appellees asserted essentially five sets of traditional grounds. First, appellees argued that the statements in question were "substantially true" as a matter of law, a concept that we explore in detail below. Among their arguments in support of this ground, appellees advocated what they term the "third-party allegation rule," urging that a

18

media defendant can establish the substantial truth of a publication reporting that third parties are asserting or alleging facts by proving that the allegations were made and accurately reported, without regard to whether the underlying allegations being reported are in themselves true or false. Relying on this concept, appellees argued that Neely's claims were predicated on accurately reported third-party allegations or investigatory conclusions actually made by the Jettons, Yu, the Travis County Medical Examiner, and the Board. Second, appellees relied upon the statutory privileges for "fair, true, and impartial" reporting of judicial or other official proceedings and "fair comment." *See* Tex. Civ. Prac. & Rem. Code Ann. § 73.002 (West 2005). Third, appellees sought to demonstrate that Neely was a limited-purpose public figure who was required to prove that they had published the statements with actual malice as to their truth or falsity, not merely negligence. *See WFAA-TV, Inc.*, 978 S.W.2d at 571. They further presented evidence—including a lengthy affidavit from Wilson detailing her research prior to the broadcast—in an attempt to conclusively negate actual malice.

In addition to the traditional grounds applicable to Neely's claims against all three of them, appellees sought summary judgment on Neely's claims against Viacom on grounds that the evidence conclusively negated any involvement by Viacom in the news gathering or publication of the broadcast. Finally, appellees also sought summary judgment on all claims asserted by Neely's professional association on grounds that it could not maintain its libel action as a matter of law.

Appellees' no-evidence grounds challenged the existence of evidence that (1) the statements in question were false or not substantially true; (2) the statements had a defamatory meaning; (3) the statements were not privileged or that appellees had abused applicable privileges;

19

(4) appellees acted with fault (either actual malice or negligence); (5) Neely was injured; (6) Neely incurred damages; (7) Viacom published the statements in question; or (8) Viacom was otherwise involved in preparing the broadcast.

On appeal, Neely brings seven issues challenging the district court's summary judgment. He first complains generally that the district court erred in granting appellees' summary-judgment motion and rendering a take-nothing judgment on his claims. In his second issue, Neely asserts that the district court erred in granting summary judgment because he presented evidence raising a fact issue as to each element of his libel claim. In his third through fifth issues, Neely challenges the judgment to the extent it is based on appellees' contentions regarding the "third-party allegation rule" (fourth issue), privileges (fifth issue), or a determination that Neely is a limited-purpose public figure (third issue). In the event he is held to be a limited-purpose public figure, Neely argues in the alternative that he presented summary-judgment evidence raising a fact issue as to actual malice. In his sixth issue, Neely urges that the district court erred in granting summary judgment against the claims of his professional association on grounds that it could not maintain a defamation claim. Finally, in his seventh issue, Neely complains of the district court's rulings excluding some of his summary-judgment evidence, including the two letters from the Board advising him of its determination that he had not violated the medical practice act in his care for Paul Jetton and Wu.

Although Neely's first and second issues are stated more broadly, he has not presented argument or authorities challenging summary judgment as to his claims against Viacom on the ground that the company had no involvement in the alleged acts or omissions that

20

are the bases for Neely's suit. Consequently, Neely has waived any challenge with respect to that ground. *See* Tex. R. App. P. 38.1(i). And, because that ground can independently support the summary judgment as to Neely's claims against Viacom, we must affirm that portion of the judgment regardless of our disposition of the other summary-judgment grounds. *See Star-Telegram, Inc.*, 915 S.W.2d at 473.

Remaining at issue is the summary judgment as to Neely's claims against Wilson and KEYE (the "KEYE defendants").

**Defamatory meaning and substantial truth**

The parties join issue primarily with respect to whether the statements published by the KEYE defendants had a defamatory meaning and, if so, whether the summary-judgment evidence presents a fact issue as to their falsity. Courts decide, as a threshold matter, whether or not a publication is capable of a defamatory meaning. *See Turner v. KTRK Tel., Inc.*, 38 S.W.3d 103, 114 (Tex. 2000). When doing so, the publication "should be construed as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it." *Id.* Thus, we do not engage in "a technical analysis" of each statement in isolation, but consider the publication as a whole, *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 154 (Tex. 2004), viewed "'not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural probable effect on the mind of the average [viewer].'" *Turner*, 38 S.W.3d at 114 (quoting *Kapellas v. Kofman*, 459 P.2d 912, 920 (Cal. 1969) (en banc)). If the publication's meaning is ambiguous or doubtful, the jury must determine its meaning. *See id.*

21

In suits against media defendants, a statement is not actionable if it is "substantially true." Under the "substantial truth" doctrine, minor inaccuracies are not actionable as long as the publication's "gist" or "sting" is true, *see id*. at 115, and a "true" statement for these purposes is one that is not more damaging to the plaintiff's reputation than a literally true statement would have been. *McIlvain v. Jacobs*, 794 S.W.2d 14, 16 (Tex. 1990). Furthermore, a true or substantially true account of facts is not made actionable merely because a viewer might infer additional but unstated false or defamatory facts from that account. *See Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995) (true statements that a grocery store manager had failed to pay for item at check-out were not false and defamatory merely because hearers might have inferred that she was dishonest; "Randall's never accused [the manager] of theft or of having the intent to steal," nor did employees "speculate or make accusations regarding [the manager's] intent"). Similar to the question of defamatory meaning, "substantial truth" can be decided as a matter of law if the meaning of the publication (i.e., a reasonable person's perception of the publication as a whole) is unambiguous and the material underlying facts are not in dispute; otherwise, the jury must first determine these matters. *See id.*

Neely has briefed and argued the issue of whether the KEYE defendants' statements at issue are true or false as if he had the burden, in responding to appellees' summary-judgment motion, to raise a fact issue as to whether they were not substantially true, and he does not contend otherwise. We will, therefore, assume without deciding that it was Neely's burden to present a fact issue that any allegedly defamatory statements at issue are not substantially true.

22

Viewing the broadcast as a whole, it was, consistent with its origins, plainly calculated to raise questions regarding how effectively the Texas Board of Medical Examiners and the medical peer review process ensure patient safety by taking action against doctors who endanger patients. To that end, the broadcast featured a negative portrayal of Dr. Neely and his medical practice. The parties dispute whether this portrayal consisted of defamatory and false statements that are actionable against the KEYE defendants. Neely insists that the broadcast as a whole was capable of being perceived by the ordinary viewer as asserting that he (1) had used "dangerous drugs" and was impaired during surgeries; (2) had performed unnecessary surgeries; and (3) had hand tremors that undermined his surgical competence. None of these assertions, Neely insists, is substantially true. Appellees counter that the broadcast does not actually contain all of the defamatory assertions Neely attributes to it, *see id.* at 646, and that any defamatory assertions it does contain are substantially true. *See Bentley*, 94 S.W.3d at 587 ("That a statement is defamatory—that is, injurious to reputation—does not mean that it is false, and vice versa.").

### *Third-party allegations*

The parties dispute the legal significance of allegedly defamatory assertions Neely perceives in the numerous statements, findings, or allegations made by persons other than the KEYE defendants that were presented or reported during the broadcast. A media defendant's reporting of a statement or allegation made by a third party may communicate factual assertions, and thus potentially be false or defamatory, at two levels—(1) the media defendant's own statements regarding whether the third party made a statement or allegation and depicting the content of the statement or allegation; and (2) the facts communicated in the underlying third-party statement or

23

allegation itself. The parties advance diametrically opposed positions as to which levels are relevant to our analysis.

In his fourth issue, Neely urges that we must consider both levels, including whether the underlying third-party allegation is in itself defamatory and not substantially true. In contrast, appellees' "third-party allegation rule" would look only to the first level, in essence viewing the reported third-party allegation not as an assertion of any facts the third party is stating, but as an assertion only of the fact that the third party has said them. If the media defendant accurately reported the fact that the third-party allegation was made and its content, appellees reason, the report is substantially true and not actionable against the media defendant, regardless of whether the underlying third-party allegation was in itself defamatory and false. This conclusion, in turn, impacts how we assess the broadcast's meaning to the ordinary viewer—whether reported third-party allegations are viewed in themselves as factual assertions being republished by and attributable to the KEYE defendants who reported them, as Neely suggests, or regarded merely as *reports about the existence or fact of* "various third-party allegations, lawsuits, proceedings, and public controversies related to Neely" being asserted by others, and whose underlying content is not attributable to the KEYE defendants, as appellees urge.

Neely argues that appellees' third-party allegation rule "is not, and never has been, the law in Texas (or, as far as [he] can discern, anywhere else in the country)," and that it would effect "a radical, indeed breathtaking, departure from long established bedrock principles of defamation law," would give media defendants "immunity to knowingly publish false and defamatory statements" (so long as such statements are originated by third parties), and would effectively destroy

24

whatever remaining protections citizens still possess when their reputations are attacked by the media. In support of his view, Neely emphasizes that liability for defamation and libel is predicated on the act of publication rather than origination or authorship. *See* Tex. Civ. Prac. & Rem. Code Ann. § 73.002, §§ .003, .004 (West 2005); *WFAA-TV, Inc.*, 978 S.W.2d at 571 ("To maintain a defamation cause of action, the plaintiff must prove that the defendant: (1) published a statement . . . ."). Consequently, as Neely observes, it has long been the rule that one who republishes a defamatory statement published by another may be held liable for his own act of publication. *See, e.g.*, *Dement v. Houston Printing Co.*, 37 S.W. 985, 986 (Tex. Civ. App.—Galveston 1896, writ ref'd n.r.e.) ("The law is clear upon the subject. One who publishes a defamatory statement made by another cannot justify by proving that the other made the statement. By publishing it, he becomes responsible for his own act in doing so, and, if he seeks to justify, he must prove the truth of the charge published."); *see also Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 838 F.2d 1287, 1289 (D.C. Cir. 1988) ("The common law of libel has long held that one who republishes a defamatory statement 'adopts' it as his own, and is liable in equal measure with the original defamer."). Neely further observes that the legislature in chapter 73 of the civil practice and remedies code enacted privileges that limit liability for publication or republication of third-party defamations under certain circumstances, thereby presuming the existence of the general rule of liability for republication on which he relies. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 73.002(a) (privileges for "fair, true, and impartial" accounts of certain governmental proceedings and "reasonable and fair comment or criticism" of "matter[s] of public concern"; privileges "do[] not extend to the republication of a matter if it is proved that the matter was republished with actual malice after it had ceased to be of

25

public concern"), .004(a) ("A broadcaster is not liable in damages for a defamatory statement published or uttered in or as part of a radio or television broadcast by one other than the broadcaster unless the complaining party proves that the broadcaster failed to exercise due care to prevent the publication or utterance of the statement in the broadcast.").

In support of their "third-party allegation rule," appellees rely on a line of Texas court of appeals cases that apply what the courts perceive to be the Texas Supreme Court's holding in *McIlvain v. Jacobs*, 794 S.W.2d 14 (Tex. 1990). *McIlvain* involved a libel suit complaining of a television news broadcast concerning an internal investigation being conducted by the City of Houston's Public Integrity Review Group ("PIRG") into allegations that some municipal employees were misusing public resources for personal ends. The report discussed both the existence of the investigation and various allegations by city employees and law enforcement that the investigation had uncovered. *See id.* at 15.[5] Two employees who had been implicated in the broadcast, Jacobs

---

[5] The audio portion of the report as broadcast consisted of the following statements:

The city's public integrity section is investigating the use of city employees for private work in the home of the city water maintenance manager.

The employees of the city water maintenance division say four payroll employees were used, on city time, to care for the elderly father of Emerick Jacobs, the manager of water department maintenance division.

The employees say they were sent by a supervisor each day to the manager's home to care for his father and do other tasks around the house.

On top of this, these same employees are putting in for overtime so they could get their city jobs done later on.

and Moore, sued the reporter and television station for defamation. The defendants moved for summary judgment on grounds that included the truth of the broadcast. The trial court granted the motion. The Fourteenth Court of Appeals reversed, holding that there were fact issues as to whether the broadcast was true. *See Jacobs v. McIlvain*, 759 S.W.2d 467, 469 (Tex. App.—Houston [14th Dist.] 1988), *rev'd*, 794 S.W.2d 14 (Tex. 1990). The court of appeals focused solely on the truth of the underlying allegations contained in the broadcast and emphatically rejected the defendants' arguments that it should consider only whether the report accurately reported the investigation and allegations:

> The summary judgment evidence certainly does not show that the underlying charges were true as a matter of law. Appellees stand by their story, maintaining that the essence of the broadcast was that charges had been made. In other words, journalists should be able to report the very fact of governmental self-scrutiny. And presumably under this umbrella they can publish potentially defamatory statements as a matter of law. We disagree. Merely alleging that an investigation was in progress does not entitle a journalist to publish free-standing allegations which are, as a matter of law, legally immune from examination under the law of libel.

*Id.* The court went on to invoke the longstanding rule that a republisher of a defamation is independently liable for that publication. *Id.* ("Although [defendants'] argument of 'truth' as a

---

> Police investigators who are conducting the investigation were looking for a gun, but they didn't find the gun at the Dalton Street Water Facility. They found liquor bottles. One city employee says drinking on the job there is not so unusual.
>
> The information about the alleged theft of City time may be turned over to a grand jury. Judd McIlvain, News Center 11.

*McIlvain v. Jacobs*, 794 S.W.2d 14, 15 (Tex. 1990).

complete defense has much to commend it, the law does not generally immunize the propagation of defamatory statements. It is no defense to say, 'It is alleged that . . . .'").

In a two-page opinion, the Texas Supreme Court reversed. *See* 794 S.W.2d at 15-16. After quoting the statements made in the broadcast, the court began its analysis by emphasizing that summary judgment would be appropriate if the statements were shown to be substantially true, and that this standard "involves consideration of whether the alleged defamatory statement was more damaging to Jacob's reputation, in the mind of the average listener, than a truthful statement would have been." *Id.* at 16. This emphasis contrasts with the court of appeals' opinion, which did not mention the substantial-truth standard or purport to apply its substance when analyzing whether the underlying factual allegations had been shown to be true as a matter of law. *See Jacobs*, 759 S.W.2d at 468-69.

The supreme court then compared the broadcast to evidence concerning the investigation and concluded, "McIlvain's broadcast statements are factually consistent with PIRG's investigation and its findings." *McIlvain*, 794 S.W.2d at 16. The court then compared the contents of the broadcast to the PIRG investigative report:

- "The broadcast stated that an investigation into the use of city employees for private work was underway. The affidavits of assistant city attorney Brenda Loudermilk and city legal department investigator V.H. Shultea, Jr. confirm the existence of the investigation." *Id.*

- "The broadcast further stated that employees of the city water maintenance division allege four employees were used on city time to care for the elderly father of Emerick Jacobs. According to the City of Houston's legal department report, employees of the water maintenance division had gone on separate occasions with Joyce Moore to St. Joseph's Hospital or to the home of Jacob's father and sat with him while he was ill. Sworn statements by a division employee indicate that on three occasions, Moore and other water

28

division employees would visit Jacob's father in the hospital during work hours, staying there for a half day or longer. While on these visits, the employees were paid their regular city wages." *Id.*

• "According to the broadcast, these employees put in overtime so they could get their jobs done. The PIRG investigation found from the payroll division office records that on several occasions, when these employees were absent from the office for as long as four hours caring for the elder Mr. Jacobs, they requested and received overtime." *Id.*

• "The broadcast further stated that police investigators were looking for a gun at the water facility but instead found liquor bottles and that one city employee claimed drinking on the job was not unusual. The report stated that the search of Joyce Moore's desk produced a liquor bottle but no gun. The PIRG report also contained statements by employees that Moore and Jacobs were seen in Moore's office drinking alcohol." *Id.*

The supreme court concluded that this "comparison of the contents of the broadcast and the PIRG report demonstrates that the broadcast was substantially correct, accurate, and not misleading," and that McIlvain had established the substantial truth of the broadcast as a matter of law. *Id.*

The Fourteenth Court of Appeals—the same court of appeals as in *McIlvain*—subsequently addressed the implications of *McIlvain* in *KTRK Television v. Felder*, 950 S.W.2d 100 (Tex. App.—Houston [14th Dist.] 1997, no writ). *Felder* arose from a series of television news broadcasts that reported on third-party allegations that a teacher had physically and verbally abused students and a subsequent school district investigation. *See id.* at 103-04. The broadcast station moved for summary judgment on grounds that included the substantial truth of the broadcast, which the trial court denied. In analyzing the substantial-truth issue, the court of appeals considered whether *McIlvain* required it to evaluate the truth of the underlying allegations or only whether the allegations had been accurately reported. *See id.* at 106. "Based on our reading of both the Supreme Court and appellate court opinions," the court concluded, "when, as in this case, the

29

report is merely that allegations were made and they were under investigation, *McIlvain* only requires proof that allegations were in fact made and under investigation in order to prove substantial truth." *Id.* The court further reasoned that this was the only conceivable reading of *McIlvain* if one considers the practical implications of a contrary interpretation:

> Otherwise, the media would be subject to potential liability everytime it reported an investigation of alleged misconduct or wrongdoing by a private person, public official, or public figure. Such allegations would never be reported by the media for fear an investigation or other proceeding might later prove the allegations untrue, thereby subjecting the media to suit for defamation. Furthermore, when would an allegation be proven true or untrue for purposes of defamation? After an investigation? After a court trial? After an appeal? Undoubtedly, the volume of litigation and concomitant chilling effect on the media under such circumstances would be incalculable. First Amendment considerations aside, common sense does not dictate any conclusion other than the one we reach today.

*Id.* The court went on to hold that summary judgment was warranted based on the substantial truth of the broadcast because it had accurately depicted the third-party allegations and the existence of the investigation into the teacher's conduct. *Id.* at 106-07.

Following the lead of the Fourteenth Court in *Felder*, the San Antonio and Fort Worth courts of appeals, as well as the Fifth Circuit, have relied on *McIlvain* and *Felder* for the proposition that a media defendant's reporting of third-party allegations and any investigation thereof is substantially true if it accurately depicts the allegations being made and the existence of any investigation, regardless of whether the underlying allegations are themselves substantially true. *See ABC Inc. v. Gill*, 6 S.W.3d 19, 33 (Tex. App.—San Antonio 1999, pet. denied) ("In sum, ABC accurately reported the rise and fall of Gill Savings and the RTC's investigation of and allegations against the Gills. No more is required."); *UTV of San Antonio, Inc. v. Ardmore, Inc.*, 82 S.W.3d 609,

30

611-12 (Tex. App.—San Antonio 2002, no pet.) ("When a case involves a media defendant, the defendant need only prove that third party allegations reported in a broadcast were, in fact, made and under investigation; it need not demonstrate the allegations themselves are substantially true."); *Grotti v. Belo Corp.*, 188 S.W.3d 768, 771 (Tex. App.—Fort Worth 2006, pet. denied) ("We hold that the Media Defendants established the substantial truth of each broadcast by accurately reporting third-party allegations and investigations."); *Green v. CBS, Inc.*, 286 F.3d 281, 284 (5th Cir. 2002) (Texas law) (broadcast reported sensational allegations against lottery winner and ex-wife; "In cases involving media defendants, such as this, the defendant need not show the allegations are true, but must only demonstrate that the allegations were made and accurately reported."); *see also Associated Press v. Boyd*, No. 05-04-01172-CV; 2005 Tex. App. LEXIS 3715, at *3 (Tex. App.—Dallas May 16, 2005, no pet.) (mem. op.) ("[M]edia defendants need only prove third-party allegations reported were made, not that the allegations themselves were true.").[6] This Court has also relied on this concept when analyzing whether there was evidence of a media defendant's actual malice in publishing an article reporting that a complaint of official misconduct had been filed against a local prosecutor. *See Cox Newspapers, L.P. v. Penick*, 219 S.W.3d 425, 431, 443

---

[6] The Fourteenth Court has also relied on *Felder* for this proposition in subsequent decisions. *See Dolcefino v. Randolph*, 19 S.W.3d 906, 918 (Tex. App.—Houston [14th Dist.] 2000, no pet.) ("When, as here, a case involves media defendants, the defendants need only prove that the third party allegations reported in the broadcast were, in fact, made and under investigation; they need not demonstrate the allegations themselves were substantially true."); *Dolcefino v. Turner*, 987 S.W.2d 100, 109 (Tex. App.—Houston [14th Dist.] 1998) ("This court has recently interpreted *McIlvain* to require only proof that third party allegations reported in the questioned broadcast were made and under investigation in order to prove substantial truth; media defendants need not demonstrate the underlying allegations are substantially true."), *aff'd on other grounds*, *Turner v. KTRK Television, Inc.*, 38 S.W.2d 103 (Tex. 2000).

(Tex. App.—Austin 2007, pet. denied). We held that there was no evidence of actual malice because the prosecutor "cannot show that the primary contents of the . . . article were false," reasoning that except for three "misstated errors" that had been corrected by a subsequent letter to the editor by the complainant, the article "accurately reported that the allegations had been filed . . . and were pending." *Id.* (citing *Grotti* for the proposition that "to prove substantial truth, the defendants need only prove that the third party allegations were in fact made and that the allegations were under investigation").

Appellees view *McIlvain* and its progeny, including *Penick*, as establishing as a clear principle of Texas law that a media defendant's statements about third-party allegations are "substantially true" if accurate in reporting that the allegations were made and their content, regardless of whether the allegations are themselves true. In other words, as appellees put it, media defendants thus need not "prove the truth of the third-party allegations before they may report on the allegations."[7] Neely counters that appellees' arguments and the court of appeals cases

---

[7] Appellees also assert that Neely "conceded that the third-party allegation rule is 'the rule of law' in Texas" in his summary-judgment response. We disagree. Neely's grounds for denying summary judgment included assertions that the gist of the broadcast was false and defamatory and that the summary-judgment evidence raised fact issues in that regard. He argued that various specific third-party allegations were defamatory, false, and actionable. In claiming that Neely conceded the validity of the "third-party allegation rule," appellees rely on a statement to the effect that this "rule," as it has been recognized by Texas courts of appeals, would not apply in this case because it is limited to reporting "that the third-party allegations were in fact made and accurately reported *and that the allegations were under investigation*." (Emphasis in original). In this regard, Neely goes on to argue that "the Broadcast was reporting on past allegations, which do not fall under the third-party allegation rule in Texas," and that, in any event, "the theory does not allow the media to publish defamatory falsehoods uttered by third parties regardless of their context, or their own knowledge of falsity." In a subsequent brief, Neely was more explicit that "the so-called 'third-party allegation rule'" does not correctly reflect Texas law, advocating essentially the same arguments he advances now. We conclude that Neely has preserved his arguments that we must consider not only

32

on which they rely are founded on a misreading of *McIlvain*, that this Court did not squarely adopt the third-party allegation rule in *Penick*, and that we are not bound by and should not follow the decisions from our sister courts that apply the concept. In Neely's view of *McIlvain*, the Texas Supreme Court looked not only to whether McIlvain accurately reported the investigation and allegations in question, but also considered whether the underlying allegations made the subject of the investigation were substantially true. Neely emphasizes that the supreme court in *McIlvain* compared the broadcast's account of city employee allegations with the PIRG report's findings. *See McIlvain*, 794 S.W.2d at 16. This, in Neely's view, is an analysis of whether the substantial truth of the underlying allegations was conclusively established by the summary-judgment evidence, not merely an analysis of whether the broadcast had accurately reported the existence of the investigation and allegations.

Neely further suggests that it is unlikely, given *McIlvain*'s brevity and the fact that it never mentions the concept, that the supreme court perceived it was altering or creating an exception to the traditional rule of liability for republication that had been emphasized by the court of appeals. As Neely observes, *McIlvain* "consumes just over two pages," "does not purport to examine the long-standing republication rule, much less reverse or carve out an exception to it," "does not announce any new rule of law, nor does it contain the constitutional or other analysis one would expect if the court had intended such a change." With this, Neely questions whether any doctrinal basis would exist for such a holding. To the extent such a holding was based on

---

whether appellees accurately reported the various third-party allegations contained in the broadcast, but also whether the underlying third-party allegations were in themselves defamatory or not substantially true.

Texas common law, Neely urges, it would amount to judicial abrogation of the legislature's balancing of interests reflected in chapter 73's privileges in a manner that renders the statutory privileges superfluous. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 73.002(a), .004(a). Nor, Neely asserts, would there be any textual support in the Texas Constitution, which, "[u]nlike the United States Constitution, . . . expressly guarantees the right to bring reputational torts" under common law. *See Turner*, 38 S.W.3d at 117 (citing Tex. Const. Ann. art. I, §§ 8, 13); *see also Ex parte Tucci*, 859 S.W.2d 1, 19-23 (Tex. 1993) (Phillips, C.J., concurring) (analyzing this feature of article I, section 8). As for the First Amendment to the federal constitution, what appellees ultimately advocate, Neely urges, is a greatly expanded version of the "neutral reportage doctrine" that some federal courts have derived from the First Amendment. *See Harte-Hanks Comm'n v. Connaughton*, 491 U.S. 657, 660 n.1 (1989) (doctrine as recognized in some lower courts "immunizes from liability the accurate and disinterested reporting of serious charges made against a public figure by a responsible, prominent organization"). However, the U.S. Supreme Court has never adopted this doctrine, *see id.*; *see also id.* at 689 ("In a case such as this involving the reporting of a third party's allegations, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." (citation omitted)), nor has the Texas Supreme Court ever purported to do. *See also Brady v. Cox Enters., Inc.*, 782 S.W.2d 272, 275-76 (Tex. App.—Austin 1989, no writ) (observing that "[a] privilege of accurate re-publication has not, to our knowledge, been recognized in Texas courts" and declining to accept it as a basis for affirming summary judgment for newspaper in libel suit). Indeed, in their briefing on appeal, appellees never identify

34

a doctrinal basis for their third-party allegation rule beyond insisting that this is what *McIlvain* and its progeny have held.

In the alternative, Neely argues that to the extent that Texas courts of appeals have recognized appellees' third-party allegation rule, the present case is distinguishable because "the relevant governmental body [the Board] had completed its investigation prior to the Broadcast and had made findings, which demonstrated that the gist of the broadcast, and certain allegations in it, were false."

Although we agree with Neely that this Court has not previously addressed the question head-on, we are compelled to agree with appellees that *McIlvain* stands for the proposition that a media defendant's reporting that a third party has made allegations is "substantially true" if, in fact, those allegations have been made and their content is accurately reported. Although *McIlvain* is somewhat oblique in its analysis, a close examination reveals that the supreme court was focused on whether the third-party allegations reported in the broadcast to be under investigation had, in fact, been made and investigated, as reflected in the PIRG report. *See McIlvain*, 794 S.W.2d at 16. Contrary to Neely's assertions, the supreme court's analysis is not couched in terms of determining whether summary-judgment evidence conclusively established the substantial truth of the underlying allegations themselves, but in terms of whether the evidence (the PIRG report, which itself was a series of allegations and findings about those allegations) demonstrated that the allegations had in fact been made and investigated as reported. *See id.* The supreme court's reasoning implies that when a media defendant reports on the existence of third-party allegations (what appellees term allegations "presented as just that—allegations"), the focus of the substantial-truth inquiry is on

35

whether the allegations were in fact made and accurately reported, regardless of the truth of the allegations themselves. In effect, we assume that the ordinary viewer perceives "allegations presented as allegations" to assert merely the fact that the allegations had been made rather than asserting or vouching for any facts referenced in the allegations.

We acknowledge that Neely raises some perplexing questions regarding the doctrinal basis for the supreme court's holding, questions that the *McIlvain* opinion did not clearly answer. We must conclude nonetheless that Neely's arguments are ultimately complaints that *McIlvain* was wrongly decided. As an intermediate appellate court, we are bound to follow *McIlvain* unless and until the Texas Supreme Court instructs us otherwise. *See Petco Animal Supplies, Inc. v. Schuster*, 144 S.W.3d 554, 565 (Tex. App.—Austin 2004, no pet.). We overrule Neely's fourth issue.

### Neely's complaints

Informed by our conclusions about *McIlvain*, we now turn to whether the broadcast as a whole was capable of the defamatory meanings Neely perceives and, if so, whether Neely raised a fact issue as to whether these assertions, so perceived, were not substantially true.

#### Use of and impairment from "dangerous drugs"

Neely emphasizes that the broadcast begins with a question posed by anchor Fred Cantu (but written by Wilson) inquiring, "If you were told you needed surgery would you want to know if your surgeon had been disciplined for prescribing himself and taking dangerous drugs . . .?" The report then identifies Neely as the surgeon who is the focus of the broadcast. After

36

a discussion of the Jetton and Wu lawsuits, the broadcast proceeds to the following discussion of the

Board's order and disciplinary action:

> **Wilson:** . . . The State Board of Medical Examiners investigated Dr. Neely. The board found Neely had a history of hand tremors and that between 1999 and 2002, Dr. Neely was writing prescriptions, not only for his patients but for himself as well. Narcotics, muscle relaxers and pain killers. Something former patient Paul Jetton finds shocking.

> **Paul Jetton:** Narcotics, opiates, I mean it's just things that, I mean things that they don't even let people operate machinery or drive cars when they're, when they're taking them and this guy's doing brain surgery on people. I mean it's just, even now I'm just, it's just incredulous, you just can't even believe that it even happened.

> **Wilson:** The State Board of Medical Examiners did discipline Dr. Neely. This past December, they suspended his license but gave it right back by staying the suspension. Now he's on probation for three years. The only requirements are that he see a psychiatrist and not write prescriptions for himself or his family. A decision the board defends.

> **Jill Wiggins** [Board representative]**:** We have compliance officers and the compliance officers will definitely follow to make sure that he's doing the things that his order requires him to do.

> **Wilson:** But how would they know if he is using? He can get somebody else to prescribe him. I mean he could say, "I've followed the order."

> **Jill Wiggins:** Right.

> **Wilson:** I didn't prescribe myself.

> **Jill Wiggins:** Right, right.

> **Wilson:** How do we, how do we know that he's, that we're not putting somebody right back out there to do the same thing he was doing before?

> **Jill Wiggins:** That's a very good question and why this order doesn't include drug testing, I, I honestly don't know the answer to that.

**Paul Jetton:** I think it's just deplorable, I mean if, if it was another profession, uh, the guy would be in jail.

Neely first complains that this portion of the broadcast, especially in the context of Cantu's introductory questions about a hypothetical surgeon who "had been disciplined for prescribing himself and taking dangerous drugs," is capable of being understood by an ordinary viewer as asserting that he had been disciplined by the Board for taking "dangerous drugs," not merely self-prescribing them. We agree that the broadcast is capable of being so understood by the ordinary viewer. Indeed, this was the import of Cantu's introductory statement referring to a surgeon (soon identified as Neely) who "had been disciplined for prescribing himself *and taking* dangerous drugs." This message was reinforced by Wilson's subsequent questions to Board representative Wiggins regarding Neely's "using" and the advisability of mandatory drug testing.

Appellees contend, however, that to the extent the broadcast indicates that Neely was disciplined by the Board for "taking dangerous drugs," it was a substantially true account of the Board's disciplinary action. We agree with appellees. Appellees emphasize, and Neely does not dispute, that the Board disciplined him for self-prescribing medications that included narcotics and other substances that had the potential to impair his ability to perform surgery. Such substances could accurately be described as "dangerous drugs" in terms of their potential risks to someone consuming them, including surgeons—and, in fact, the Board's order uses that term, prohibiting Neely from prescribing "controlled substances or dangerous drugs with addictive potential or potential for abuse" to himself or his immediate family. Neely also admitted during his deposition that he not only self-prescribed these substances, but used some of them. Neely insists, however,

38

that the broadcast nonetheless departed from the true facts because he was not disciplined by the Board for taking these medications, per se. Instead, Neely insists, the Board disciplined him solely for self-prescribing the medications.

We conclude that any factual discrepancies here would not rise to the level of rendering an assertion that Neely was "disciplined for . . . taking dangerous drugs" not substantially true. Neely's use of self-prescribed medications was plainly a focus of the Board's order. The order prohibited Neely from prescribing, dispensing, or administering "controlled substances or dangerous drugs with addictive potential or potential for abuse" to himself. Furthermore, the order was consistent with a concern of the Board that Neely might have become addicted to medications he was self-administering. The order required him to be evaluated by a Board-appointed psychiatrist who was board-certified in forensic or addictive psychology. These evaluations had not yet been performed, or the underlying issues resolved, at the time of the broadcast. In short, even if it was not literally true that Neely had been "disciplined for . . . taking dangerous drugs" in terms of the precise legal bases of the Board's order, that assertion would at least be substantially true because it would be no more damaging to Neely's reputation in the eyes of the ordinary viewer than a literally true recitation of the Board's order would have been. *See McIlvain*, 794 S.W.2d at 16.

Neely further complains that the broadcast is capable of being understood by the ordinary viewer as going farther to assert that (1) he had operated on patients while under the influence of the medications he was self-prescribing (and/or using) and that (2) this was the conduct for which the Board had disciplined him. Neither assertion, Neely insists, is substantially true. While acknowledging that he had used narcotics and other medications he had self-prescribed,

39

Neely presented summary-judgment evidence that he did so only at times when it would not affect his treatment of patients, that his use was for legitimate medical needs, and that he had never treated or operated on patients while under the influence of drugs. Similarly, while a fully accurate depiction of the Board's order would have been damaging to Neely's reputation as a neurosurgeon (as was the broadcast's substantially true depiction of the order as disciplining him for "taking . . . dangerous drugs"), to suggest that the Board disciplined him for *operating on patients* while under the influence of those drugs, Neely suggests, would be so much more egregious a disciplinary ground as to exceed the limits of the substantial-truth doctrine. *See Turner*, 38 S.W.3d at 118.

In response, appellees insist that the broadcast is not capable of being understood as asserting that Neely had operated on patients while under the influence of drugs or that the Board had disciplined him for such acts. Appellees emphasize that no one from KEYE made such an assertion during the broadcast and that, to the contrary, Wilson provided an accurate (or at least substantially true) description of the Board's order. Neely's arguments to the contrary center on Paul Jetton's on-camera statements, "Narcotics, opiates . . . things that they don't even let people operate machinery or drive cars when they're, when they're taking them and this guy's doing brain surgery on people," and "if it was another profession, uh, the guy would be in jail." Paul's comments are presented in the broadcast as referring specifically to Wilson's preceding revelation that the Board had disciplined Neely in connection with his self-prescription of medications. After Wilson recounts that "[t]he State Board of Medical Examiners investigated Dr. Neely" and "found . . . that between 1999 and 2002, Dr. Neely was writing prescriptions, not only for his patients but for himself as well. Narcotics, muscle relaxers and pain killers," she segues to Paul's comments with, "[s]omething

40

former patient Paul Jetton finds shocking." Then, Paul, with apparent reference to what the Board "found," observes, "[n]arcotics, opiates, I mean it's just things that, I mean things that they don't even let people operate machinery or drive cars when they're, when they're taking them." He then states, ". . . and this guy's doing brain surgery on people." Wilson then continues with her critical discussion of the Board's disciplinary action and the Board's "defen[se]" or justification for it.

Considered in context, Paul's statements were capable of being understood by the ordinary viewer as Paul's own factual inferences or allegations that he derived from the Board's agreed finding that Neely had self-prescribed medications, namely, that Neely had treated patients while under their influence.[8] Appellees rely on their "third-party allegation rule," urging that this portion of the broadcast is substantially true and not actionable against them because it accurately depicted Paul's own allegations. Under *McIlvain*, we agree. The broadcast explicitly presented Paul's "allegations as allegations," as indicated by Wilson's preface that the Board's finding was "[s]omething that former patient Paul Jetton finds shocking."

---

[8]    While relying primarily on their "third-party allegation rule," appellees argue that Paul Jetton's statements would not be actionable even in themselves because they represent Paul's "opinions" or "rhetorical hyperbole" rather than actionable assertions of fact. This argument alludes to the principle that the First Amendment may, in certain contexts, restrict defamation liability for utterances that cannot reasonably be interpreted as stating actual facts about an individual. *See New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 155-61 (Tex. 2004); *Bentley v. Bunton*, 94 S.W.3d 561, 579-81 (Tex. 2003) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990)). Assuming without deciding that this limitation would apply to Paul's statements here, we cannot conclude, as a matter of law, that the statements cannot be reasonably interpreted to state actual facts about Neely—that Neely had operated on patients while under the influence of self-prescribed "[n]arcotics, opiates."

In contending that the KEYE defendants' reporting of Paul's statements is actionable, Neely argues that the KEYE defendants "juxtaposed" Paul's statements with other facts or "omitted" other material facts to create misleading "impressions" that he had operated on patients while under the influence of self-prescribed drugs or that the Board had disciplined him for such conduct. He further complains that the KEYE defendants "linked" these "impressions" to Paul's and Wu's adverse outcomes and related allegations. Neely relies on the principle—implicit in the rule that allegedly defamatory publications must be construed as a whole—that a publication comprised of statements that would each be substantially true or non-defamatory in isolation may nonetheless be susceptible to a false and defamatory meaning due to the selective juxtaposition or omission of material facts to create a misleading impression. *See Turner*, 38 S.W.3d at 114-15. This principle "represent[s] the converse of the substantial truth doctrine. . . . [it] permit[s] liability for the publication that gets the details right but fails to put them in their proper context and thereby gets the story's 'gist' wrong." *Id.* at 115. For example, in *Turner*, the Texas Supreme Court held that a television news investigative report selectively omitted material facts to convey a substantially false and defamatory impression regarding a then-Houston mayoral candidate's actions as an attorney in a probate proceeding in which the purported decedent faked his own death. The report had emphasized that the candidate, Hon. Sylvester Turner, "[d]espite the signs of something fishy . . . began the legal effort to get millions in insurance money released and get his mutual friend . . . appointed as administrator over the estate," and aided the friend as he "sought control of the estate" and "petitioned the court to become administrator." *Id.* In support of its holding, the supreme court observed that the report omitted mention that the purported decedent's will had

42

named the "mutual friend" as independent executor and that the primary beneficiary of the funds was to be the decedent's father. *Id.* The supreme court concluded that, because of these selective omissions and juxtapositions of facts, the report was susceptible to the false and defamatory meaning that Turner had taken these actions on his own volition and perhaps was seeking to benefit personally from the "death." *Id.*

Although it is theoretically possible for a report comprised of otherwise non-actionable third-party allegations to nonetheless convey a defamatory or false meaning through the selective juxtaposition or omission of other material facts, as appellees seem to acknowledge, Neely cannot identify any such juxtapositions or omissions here. The "juxtaposition" of which Neely complains seems to be that the KEYE defendants included Paul Jetton's statements in the broadcast to create the "misleading impression" that Jetton's allegations were true. As for "omitted" material facts, Neely merely contrasts Paul's allegations with the actual content of the Board's order. Without more, we believe that *McIlvain* precludes us from holding that these aspects of the broadcast can be considered to convey the sort of false or defamatory impression that could support a libel claim against the KEYE defendants. To the contrary, this is a case closer to *Randall's*, in which Neely is advocating the imposition of defamation liability based on additional but unstated inferences that he would derive from a "substantially true" report of third-party allegations. *See Randall's Food Mkts., Inc.*, 891 S.W.2d at 646.

In sum, we conclude that, as a matter of law, the KEYE defendants did not make actionable assertions that Neely had operated on patients while under the influence of the medications he had self-prescribed or that the Board had disciplined him for such actions. To the

43

extent that Neely complains that the KEYE defendants asserted that he had been disciplined by the Board for "taking dangerous drugs," those assertions are "substantially true" under Texas law.

*Surgeries*

Neely also asserts that the broadcast created the defamatory and false "impression" that he performed unnecessary surgeries. He complains in particular of Sheila Jetton's statement that "[e]very neurosurgeon that's looked at Paul's MRIs from before Neely operated on him have said they never would have done surgery [but] would have watched him with MRIs over years." Sheila's assertion was immediately preceded by Wilson's statement, "Paul's wife Sheila says what they learned from other doctors was the final blow." Thus, considering these statements together, Sheila is making an allegation regarding what "other doctors" told the Jettons about the necessity or advisability of surgery. Under *McIlvain*, this accurate depiction of Sheila's statement is not actionable because it is considered to be "substantially true." *See McIlvain*, 794 S.W.2d at 16. Nor does Neely identify any juxtaposition or omission of facts that would cause the broadcast as a whole to convey an actionably false impression regarding the necessity of Paul's surgery. *See Turner*, 38 S.W.3d at 117-19. To the contrary, the broadcast included Wilson's acknowledgment of Neely's position that "two highly qualified neurosurgeons who reviewed the case agree with the medical decisions made by Dr. Neely." In short, the gist of this aspect of the broadcast is that the Jettons and some doctors were of the opinion that Paul's surgery had not been indicated while other doctors believed it was. Neely has not raised a fact issue as to whether the broadcast was not substantially true with respect to the necessity of Paul's surgery. *See McIlvain*, 794 S.W.2d at 16.

44

Neely also asserts that the broadcast created a false impression that he had performed surgery on Wei Wu to treat brain cancer that had never actually existed. The broadcast, as previously noted, displayed a video clip of Neely testifying during his deposition that Wu "was found to have a . . . very major brain tumor thought to be a meningioma at the time because it, of the location in the brain . . . was taken to the OR thereafter and found to [have] malignant melanoma." It then proceeded to emphasize the impact of the "diagnosis that Wu had only a few months to live," concluding with Wilson's suggestion that "[i]t may have been too much for Wei Wu to handle" and her account of Wu's suicide. Then, as a visual image of the autopsy report was displayed on the television screen, Wilson proceeded to recount, "But when his body was sent to the Travis County Medical Examiner's office analyzing Wu's brains, examiners noted no residual metastatic melanoma." As Wilson made this statement, the phrase "no residual metastatic melanoma" in the image of the report was highlighted and enlarged to cover the entire width of the screen. Wilson then offered her own explanation of that phrase's significance: "*Meaning Wei Wu did not have brain cancer.*"

Neely insists that Wilson's statement, "Meaning Wei Wu did not have brain cancer" could be perceived by an ordinary viewer as an assertion that Wu had never had cancer after all— i.e., that for some inexplicable reason (or, e.g., the influence of self-prescribed medications) Neely had performed brain surgery on Wu to treat a "very major brain tumor" that was never really there. Appellees counter that the broadcast's gist was instead that Neely and the medical examiner had differed as to whether Wu had any cancer remaining in his brain *after* Neely's surgery. In support, appellees emphasize the examiner's phrase "no *residual* metastatic melanoma" (a phrase that

45

was highlighted and enlarged in the visual portion of the broadcast), the broadcast indication that Wu's autopsy had occurred after Neely had performed surgery, and the fact that Wilson's statement is a present-tense description of whether Wu had cancer at that time, not an assertion that he never had brain cancer. We agree with appellees. Considering the broadcast as a whole, *see Turner*, 38 S.W.3d at 114, we conclude as a matter of law that a viewer of ordinary intelligence would necessarily perceive Wilson's no-cancer explanation to refer to Wu's condition after Neely had performed surgery, not as an assertion as to whether Wu had ever had cancer. The broadcast's depiction of the competing views of Neely and the medical examiner regarding the continued presence of cancer, furthermore, was substantially true. *See McIlvain*, 794 S.W.2d at 16; *see also Randall's Food Mkts., Inc.*, 891 S.W.2d at 646 (absent factual omissions and juxtapositions, a substantially true account of facts is not actionable, regardless of any false or defamatory facts a viewer might infer from that account). In sum, Neely has not raised a fact issue as to whether the broadcast was not substantially true with respect to whether he performed unnecessary surgeries.

*Hand tremors*

Finally, Neely argues that the broadcast created the false and defamatory impression that he suffered from hand tremors that impacted his surgical competence. The broadcast mentions hand tremors in the anchors' introductory remarks ("If you needed surgery would you want to know if your surgeon . . . had a history of hand tremors . . . ?") and in Wilson's summary of the Board's findings ("The board found Neely had a history of hand tremors . . . ."). This is an accurate depiction of the Board's agreed order. The order, as previously explained, included findings that Neely "had a prior history of tremors," and that "the Board's investigator claims to have witnessed a

46

tremor during the 2002 interview" (which Neely did not dispute but attributed to "nervousness about the interview"). Further, the Board ordered that Neely undergo evaluation by a Board-approved physician for any condition which, without adequate treatment, could adversely affect Neely's ability to safely practice medicine. We conclude, as a matter of law, that the broadcast was substantially true with respect to its account of Neely's "history of hand tremors." *See McIlvain*, 794 S.W.2d at 16. As for Neely's assertion that this substantially correct portrayal created the "impression" that hand tremors impacted his surgical competence, this additional inference is not actually stated in the broadcast. *See Randall's Food Mkts, Inc.*, 891 S.W.2d at 646.

### *Conclusion regarding defamatory meaning and substantial truth*

Under *McIlvain*, we conclude that, as a matter of law, the KEYE defendants (KEYE and Wilson) stopped short of making actionable defamatory and false assertions about Dr. Neely in their January 19, 2004 broadcast. We hold that the district court did not err in granting summary judgment on the grounds that the statements in question were, as a matter of law, not actionable because they are considered to be either "substantially true" or not defamatory.

**Remaining issues**

The foregoing holdings would require us to affirm summary judgment as to all of Neely's claims unless there is merit to Neely's seventh issue, in which he contends that the district court abused its discretion in excluding some of his summary-judgment evidence. Two evidentiary rulings are the focus of Neely's seventh issue. First, Neely complains of the district court's exclusion of certain excerpts from the affidavits of two of his attorneys, the

attorney who represented him in his medical-malpractice litigation and the attorney who represented him before the Board. These excerpts concern communications the attorneys had with Wilson prior to the broadcast which, in Neely's view, are relevant to Wilson's actual malice. Because the summary judgment can stand on grounds other than absence of evidence of fault, any error in the district court's exclusion of these excerpts is harmless. *See* Tex. R. App. P. 44.1(a)(1).

The second evidentiary ruling of which Neely complains is the district court's exclusion of the two letters from the Board concerning its investigations of complaints regarding Neely's care of Paul Jetton and a group of patients that included Wu. Each letter, as previously discussed, indicates that the Board had found no violation of the medical practice act and was closing its investigation. Appellees objected to each letter as "irrelevan[t] and inadmissible hearsay if offered for the truth." The district court sustained the objection without specifying the grounds. On appeal, Neely argues that the letters are relevant to show that "the gist and impressions created by the Broadcast are false." In light of our holdings regarding the broadcast's meaning and third-party allegations, we cannot conclude that Neely has shown harm from any error in these rulings. *See id.* We overrule Neely's seventh issue.

The district court did not err in granting summary judgment on the grounds that, as a matter of law, the KEYE defendants did not make actionably defamatory or false (i.e., not substantially true) assertions in the broadcast and that Viacom had no involvement in preparing or publishing the broadcast. Accordingly, we overrule Neely's first and second issues. We do not

48

reach—and express no opinion regarding—Neely's remaining issues challenging appellees' other

summary-judgment grounds.[9]  *See* Tex. R. App. P. 47.1.

## CONCLUSION

We affirm the district court's judgment.

_____

Bob Pemberton, Justice

Before Justices Pemberton, Rose and Goodwin

Affirmed

Filed:   February 9, 2011

---

[9]  I.e., Neely's third, fifth and sixth issues.